**UNITED STATES of America**

v.

**Jaime Lerma SANCHEZ and Carlos Guillermo Salinas, Jr.**

**Cr. 4–1211.**

United States District Court,
N. D. Texas,
Fort Worth Division.
June 25, 1973.

Phil Burleson, Dallas, Tex., for defendants.

Conard Florence, Asst. U. S. Atty., Fort Worth, Tex., for the Government.

## OPINION ON MOTION FOR NEW TRIAL

BREWSTER, District Judge.

The defendants have filed a motion for new trial urging twelve grounds. Some of them will be discussed in this opinion.

### Complaints of Rulings Prior to Trial

Grounds 3 through 7 complain of certain rulings of Judge Eldon Mahon prior to the trial.

Chief Judge Brewster and Judge Mahon are located at Fort Worth. Judge Brewster takes responsibility for a good part of the trials in Fort Worth, because Judge Mahon has a large part of the docket in Dallas formerly handled by Judge Estes before he became a Senior Judge on July 1, 1972. The case *sub judice* was designated to be tried before Judge Brewster. He handled all arraignments, and set the trial date.

Thirteen defendants were indicted; but one of them was in custody of the authorities of the Republic of Mexico in Nuevo Laredo, and the United States never got jurisdiction over him. Ten of the remaining twelve pleaded guilty, and only Lerma and Salinas were left for trial.

After the trial date on Lerma and Salinas was set, those defendants filed some pre-trial motions which required hearing and action at a time when Judge Brewster was to be out of the state at a Chief Judge's meeting. Judge Mahon heard such motions for Judge Brewster, and complaint is made of some of his rulings at the hearing.

The first complaint is that Judge Mahon overruled these defendants' motion to transfer this case to the Laredo Division of the Southern District of Texas. The reason given was that all transactions involving these defendants allegedly occurred in that Division.

Venue in this case is determined by Rule 18, F.R.Crim.P., which provides that "the prosecution shall be had in a district in which the offense was committed."

■ It has long been the law that in federal courts venue of prosecution for conspiracy lies in the district where the agreement was made or an overt act in furtherance of the conspiracy was committed. Hyde v. United States, 225 U.S. 347, 363, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); Miller v. Connally, 5 Cir., 354 F.2d 206, 208 (1965); Bellard v. United States, 5 Cir., 356 F.2d 437 (1966), cert. den., 385 U.S. 856, 87 S.Ct. 103, 17 L. Ed.2d 83; United States v. Williams, 5 Cir., 424 F.2d 344 (1970): Rule 18, F.R. Cr.P.

■ The conspiracy here involved covered a wide territory from the Tex-as-Mexican border to Kansas City, Kansas. The government's evidence supported the theory that Lerma and Salinas were large suppliers near the top of a dope ring that could furnish cocaine in big lot quantities; that the defendant, Laurel, was one of their jobber outlets; that Laurel sold the cocaine obtained from them to wholesalers in the area of the University of Texas at Austin, Texas Christian University at Fort Worth, and University of Texas at Arlington.[1] While the conspiracy "agreement" between Laurel, Lerma and Salinas may have been formed in the Laredo Division of the Southern District, several of the other defendants joined in the conspiracy in Fort Worth and Dallas. Many of the overt acts alleged in the indictment occurred in the Fort Worth-Dallas area, which is in the Northern District of Texas. Laurel was arrested at the Dallas airport as he was bringing in a large quantity of cocaine to complete a sale. The defendants, Branum and wife, Garnett, Speake and Ray were arrested in a motel room at Arlington, Texas, as they prepared to consummate a sale of two pounds of cocaine to government undercover agents for the wholesale price of $26,400.00.[2] Under those circumstances, venue was properly laid in the Northern District of Texas.

While the indictment was returned into the Fort Worth Division, the case was tried in the Abilene Division.[3] At the time of the arraignments, there was not enough time left to get the case to trial in Fort Worth before Judge Brewster went to Abilene for the May docket there. Judge Mahon already had a full setting for May. These defendants were in jail, and Judge Brewster inquired of their counsel in open court if they wanted the case tried in Abilene where it could be reached in May. Counsel for

---

1. Arlington is in the same county as Fort Worth.

2. The $26,400.00 in currency was there and had been counted out by one of the defendants. The "street value" of this two pounds after cutting would have been over $250,000.00. It was slated for final distribution in the area of University of Texas at Arlington and of Texas Christian University. Branum was a recent dropout at U. T. A. at Arlington. Garnett, Speake and Ray were first stringers on the football team at Texas Christian University.

3. Abilene is about 150 miles west of Fort Worth. Both Divisions are in the Northern District of Texas.

Lerma and Salinas stated they consented to the trial in Abilene.[4]

■ What these defendants actually wanted was to get the case transferred to the city where they lived and possibly had some influence. Residence of the defendants is not a relevant factor. United States v. Valle, D.C.S.D.N.Y., 16 F.R.D. 519 (1955).[5]

The other complaints directed at Judge Mahon's rulings relate to discovery. The practice in the Fort Worth Division to require the government to give much more information than the law requires is long established and rather well known in judicial circles. During his four years as United States Attorney here before going on the bench about a year ago, Judge Mahon followed that practice in criminal cases in this Court. He became a believer in it, and has established it in cases in his Court. The practice is very informal. The United States Attorney is required to show his entire file and make a complete disclosure to defense counsel in all but the most exceptional cases.[6] A limited disclosure is made where the file also contains matters relating to investigation of unrelated offenses,[7] or where there is a question about whether the identity of the informer should be revealed. Those decisions are not left to the United States Attorney. Under the practice, he must secure the approval of the judge to make less than a full disclosure.

Such a practice results in making available to defense counsel *in advance of the trial* not only statements he could not get under the criminal discovery rules, but also reports of the investigative officers. Those reports are valuable because they summarize the government's case and usually indicate how the evidence will be used to prove the offense.

Judge Mahon left it to the parties to proceed under this practice, knowing that almost invariably it works out all discovery and bill of particular problems.

When the motion for new trial was presented to Judge Brewster, he inquired of defense counsel what he had failed to get. He said that his only complaint about discovery was that he was not given the statement of the defendant, Laurel, until Sunday [8] before the case went to trial on Monday. That was considerably earlier than he could have obtained the statement if he had been held to what the law allowed him. Under 18 U.S.C. § 3500, he was not entitled to it until after Laurel testified on direct examination.

There is nothing in the record to indicate that the government knew, prior to the date it gave the statement to defense counsel, that Laurel would actually testify. The indications were to the contrary. It had permitted him to remain in the same cell block in jail with Lerma and Salinas for some time. During that period, Lerma and Salinas did not suspect that he would be a witness against them, for they were congenial with him. The first indication of suspicion that he would be a government witness came after he was separated from them shortly before the trial, when Salinas' uncle

---

**4.** He was probably happy to get the case away from Fort Worth, where Texas Christian University is located. Most defense lawyers would rather not have tried the case in the city where the three T. C. U. football players had been widely publicized.

**5.** In the Valle case, Judge Irving Kaufman said: ". . . . The Constitution and Rule 18 do not compel a trial in the place of residence of the defendants which in effect these defendants seek by the instant application."

**6.** The exceptional cases are ones where witnesses will likely be endangered.

**7.** This frequently occurs where the informer is working on several cases during the same period. The reports of the government agents usually cover all the transactions on which they are working with the informer.

**8.** In a place like Abilene, out-of-town lawyers awaiting trial usually work on their cases on weekends. Both prosecution and defense counsel arrived at Abilene several days before the trial and worked most of the Saturday and the Sunday before the trial started on Monday.

called Mrs. Laurel and told her that "it would not help" Laurel if he testified for the government.

Cases involving substantial traffic in dope are ones where this Court does not require disclosure in advance of the trial of matters that may affect the welfare of witnesses. A man who would traffic dope into schools would not hesitate to threaten or harm a witness if he thought he could help his defense by doing so.

Prior to the trial, the United States Attorney gave to defense counsel a Xerox copy of all of the government[9] file except a few small portions dealing with unrelated conspiracies involving other persons which were excerpted. A Xerox copy of the *complete* file was furnished the Court with the excerpts properly identified. The Court examined the entire file *en camera* and concluded that the excerpts related to matters having no possible relevance, and did not require such excerpted matters to be furnished to the defense. That file is being sealed and made a part of the records in this case for examination by the appellate court. That was the practice followed by this Court in United States v. Ramzy, 5 Cir., 446 F.2d 1184 (1971), where Chief Judge Brown said at p. 1187:

"Finally, we reject the argument that the defense was prejudiced by the denial of access to a small portion of the government's file. The Trial Court, in fact, was extraordinarily generous in its allowance of discovery, and after examining the excluded material we have found that it contains nothing that could possibly have materially aided the defendant in the preparation of his case."

### Qualifications of Juror and Misconduct of Jury

The motion for new trial alleges misconduct of the jury as follows:

"The jury received unsworn testimony and new evidence of a material nature during their deliberations when the foreman, Mr. J. C. Teague, told the other jurors that he had previously been convicted of transporting beer and wine in a dry area and told the other jurors how two friends of his asked him to get the beer and wine (48—quarts of can beer and 56—⅘'s of wine) in a wet area and bring it back to them in a dry area; that the two friends paid him (Teague) to so transport the beer and wine; that he (Teague) was arrested and prior to the actual arrest, it was agreed between the three men that Teague would take the blame for all the beer and wine; that Teague told the police it was his beer and wine (and did not tell the police that the beer and wine was bought for the two friends, with money from the two friends and that he was being paid to transport the beer and wine), all as more fully shown by the testimony of the jurors. Such unsworn new facts and testimony was made before the jury had unanimously decided the guilt of these Defendants. Such unsworn new facts and testimony was made before the jury unanimously agreed that these Defendants were part of a conspiracy and such statements by Teague were made to demonstrate how certain persons (his two friends) can be part of a conspiracy, as shown by the testimony of said jurors."

The motion further alleges that the juror was disqualified because the maximum possible penalty for his offense was more than one year.

Shortly after the return of the verdict, defense counsel advised the United States Attorney and the Court by long distance telephone[10] that he had been

---

9. The defense got much more than the law required. It got all the official reports of the narcotics agents and statements of persons who did not testify.

10. Defense counsel had gone back to his office in Dallas. The Judge was still holding court in Abilene.

obligated to pursue the matter further. informed that Mr. Teague, one of the jurors, made a statement during the deliberations to the effect that he had once been convicted of a violation of the Texas Liquor Control Act,[11] and that he felt

He then filed a motion for leave to interview the jury.

 This Court does not permit the disgusting practice of unbridled interrogation of jurors about their deliberations.[12] However, where good ·

11. Chapter 8, Title 11, Vernon's Ann.Penal Code of Texas.

12. Interviews of jurors by persons connected with a case relating to their deliberations must necessarily be conducted only with permission of the Court and under conditions where the jurors will not be subjected to harassment. Such interviews have never been favored by the federal court except in extreme situations. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1932); Rakes v. United States, 4 Cir., 169 F.2d 739, 745 (1948); United States ex rel. Daverse v. Hohn, 3 Cir., 198 F.2d 934 (1952); Northern Pac. Ry. Co. v. Mely, 9 Cir., 219 F.2d 199 (1954); Complete Auto Transit, Inc. v. Wayne Broyles Eng. Co., 5 Cir. 351 F.2d 478 (1965). The quotations which follow show the good reason for the rule:

"... But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant *subject of public investigation*; to the destruction of all frankness and freedom of discussion and conference." 238 U.S. at 267, 35 S.Ct., at 784, 59 L.Ed. at 1302. This language is quoted by the Court of Appeals for the Fifth Circuit in Complete Auto Transit, Inc. v. Wayne Broyles Eng. Co., supra, 351 F.2d, at 480.

"... Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world ..." 298 U.S., at 13, 53 S.Ct., at 469, 11 L.Ed., at 999.

"'... We do hold for future guidance that it is improper and unethical for lawyers, court attaches or judges in a particular case to make public the transactions in the jury room or to interview jurors to discover what was the course of deliberation of a trial jury." 219 F.2d, at 202.

"... rule requires that jurors are not to be harassed in any manner because of a verdict they have rendered. If jurors are conscious that they will be subjected to interrogation or searching hostile inquiry as to *what occurred in the jury room and why*, they are almost inescapably influenced to some extent by that anticipated annoyance. The courts will not permit the potential influence to invade the jury room. He who makes studied inquiries of jurors as to what occurred there acts at his peril, lest he be held as acting in obstruction of the administration of justice. * * * a searching or pointed examination of jurors in behalf of a party to a trial is to be emphatically condemned. It is incumbent upon the courts to protect jurors from it.' Rakes v. United States, 4 Cir., 169 F.2d 739, 745–746. 'Jurors are free from any such espionage, attack, inconvenience, or inquiry. * * * What occurred there is sacred. * * * Great care and constant vigilance are exercised to prevent extraneous and outside influences. An equal respect for the verdict after rendition in so far as jury room deliberations are concerned is necessary.' United States v. 120,000 Acres of Land, D.C., 52 F. Supp. 212, 213." 219 F.2d, at 201, footnote 1.

This policy is of particular importance since the passage of the Jury Selection and Service Act of 1968. 28 U.S.C.A. §§ 1861–1871. Sec. 1866(a) authorizes the Court to require up to thirty days of service by a juror. Sec. 1861, entitled "Declaration of Policy", says that it is the public policy that qualified persons "shall have an obligation to serve as jurors when summoned for that purpose." Those of us who have dealt with jurors know that experience helps them to render better service. They are less awe stricken and are more independent. They quickly learn how to follow evidence. They become strongly objective, and develop a deep pride in justice. There is less chance of misconduct. This judge never has a full panel of green jurors any more. As individual jurors complete their thirty days, new ones are summoned to fill their places. The result is that juries in the box are usually composed about equally of jurors with experience and those with little or no experience. Most lawyers like it because they do not

cause appears, the Court does allow jurors to be interrogated in a manner that does not amount to harassment. That must be done under order of the Court and under circumstances where there will be reasonable expectation that lawyers in all subsequent cases will not be filing motions claiming that the minds of the jurors were poisoned by lawyer's or investigator's statements made during the previous interrogation. Usually, the interviews are required to be recorded, so as to limit them to relevant interrogations and to prevent the prejudicial statements that are usually made at the opening of uncontrolled interviews in order to make the juror want to help the questioner.

In this case, the defendants were represented by a highly reputable and competent lawyer whom the Court believed to be well above the objectionable tactics heretofore mentioned and somewhat more detailed in footnote 12. The Court granted defense counsel permission to interview any or all of the jurors in any manner he desired. He stated he preferred to conduct his interviews before the Court, in the presence of the United States Attorney, with the juror under oath and his testimony being recorded by the court reporter. That was the procedure which was followed.

The hearing was originally set for 1:00 P. M. on Thursday, June 7, 1973. Due to some travel difficulties on the part of defense counsel, the start of the hearing was delayed until 4:00 P. M. Defense counsel summoned six jurors to appear for the afternoon hearing with the understanding that the remainder would be heard the following day if he

---

have to worry about how jurors will take objections, and they know it is easier to make the jurors understand the case. After having followed this policy for several years, I have not seen the slightest indication that it results in favor to litigants, plaintiff or defendant, on either side of the docket, civil or criminal. My conclusion is that such juries take pride in being able to consider each case on its own merits.

The policy of requiring jurors to serve thirty days would have to be abandoned if the parties or their representatives could harass the jurors after the verdict. Some of the jurors would not be as objective or independent if they knew they were going to be called to task and have their deliberations atomized by skilled interrogators in every case. The plaintiffs in personal injury cases would tell them that the defendant who had appeared to be a person of moderate means was in fact heavily insured, and that the insurance company tried to starve him and his family into a small settlement. The defendant would tell them that the reason their public liability insurance premiums were so high was because of large verdicts for the plaintiff. Each party would say that the picture before the jury would have been entirely different if the judge had not ruled out important evidence. In criminal cases, the defendant or his wife would take their small children to the houses of the jurors to get sympathy. If that were not done, he would have a tale of woe as to how he was mistreated by the government and the court. The prosecution would tell the jurors about how many times the defendant had been indicted and arrested without being indicted. I know from long experience that these things happen in trials in the state courts here.

It was practices such as the ones set out above that resulted in the recent passage of a statute in Texas, where there is no limitation of any kind on interviews of jurors about their deliberations, requiring that a juror be finally discharged from further service after he has been on one jury.

If interrogation of jurors about their deliberations were not controlled in the federal courts, justice to subsequent litigants would require that each juror be finally discharged after serving on one jury.

Even so, the cases above cited recognize that there can be situations where it would be necessary to inquire into matters that occurred during jury deliberation. McDonald v. Pless, supra, which condemns unlimited exploration into the deliberations of a jury, says that the policy cannot be inflexible "because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice. . . .'" 238 U.S. 268–269, 35 S. Ct. 784, 59 L.Ed. 1302. Immediately following such quotations, the Supreme Court indicates an intention to give the trial judge some discretion in the matter by refusing to say "how far such evidence might be received by the judge on his own motion." Under the inherent authority so recognized, the Court exercised his discretion in favor of allowing full interrogation of the jurors to determine if anything might have occurred that affected the fairness of the trial.

deemed it advisable. The six jurors subpoenaed by the defense were interrogated under the plan requested by defense counsel. One of them was Mr. Teague, the juror who made the statement as to his own prior conviction. Defense counsel was permitted to ask any question he desired and his interrogation was thorough and complete. At the conclusion of the interrogation of the six jurors, defense counsel stated that if the government would stipulate that the remaining jurors would testify along the same lines as the six who had appeared that day, he would close his interrogation of the jurors, prepare a motion for new trial and offer the record of the sworn answers of the jurors during the Thursday afternoon session as the evidence supporting his motion, and submit the matter to the Court in that fashion. The government made the stipulation suggested, and the plan outlined by defense counsel was followed. His motion for new trial was filed the next day. The record made in the Thursday proceeding was offered by the defendants, and the motion was overruled.

The defendants were present at all times during the Thursday afternoon session and the Friday hearing. An interpreter for Lerma was also present, and he translated the entire proceedings to Lerma as they transpired.

The jurors were sworn and put under the rule at the beginning of the Thursday afternoon session. They were instructed not to discuss the matters in issue with each other. They arrived at the courthouse shortly before the hearing began, and the many variations in their testimony clearly indicated that they had discussed the issue among themselves very little, if at all.

At the conclusion of the proceedings, defense counsel stated that he was perfectly satisfied with the way they had been conducted.[13]

As the trier of facts, I thought each juror who testified was honest about his testimony. As is stated above, there were many variances in their testimony. Those were due, I thought, to the casual way in which the remark complained of was made, to the fact that the jurors at-

13. The following is quoted from the proceedings at the conclusion of the interrogation of the jurors under oath on Thursday afternoon:

"MR. BURLESON: Your Honor, in reference to the other jurors, particularly since some of them are not available because of being still on the jury, we would like to offer a stipulation that if the other six jurors were called, their testimony under oath would be along the same line as the testimony of these six jurors in reference to the questions asked, recognizing that there were differences in each of these; but it would be along the same line as each of these testified.

"THE COURT: That some of them would differ among themselves, like these did?

"MR. BURLESON: Yes, sir.

"THE COURT: All right, do you want to stipulate to that?

"MR. McGLINCHEY: Yes, sir, Your Honor.

"THE COURT: All right now, that is with the understanding that while I would not let you talk to these two or three jurors who are on the mail fraud case I am presently trying, until after they return their verdict, if you want to wait until they are through with the mail fraud case,

you will have the same right to interview them that you have had with these? In other words, I do not want to be in the position of having the record indicate even remotely that I tried to cut you off from anything. You would only have to wait until they return their verdict. I think you understand that.

"MR. BURLESON: Yes, sir.

"THE COURT: You would not want lawyers interviewing your jurors while you were in the trial of a case?

"MR. BURLESON: No, sir, I sure would not.

"THE COURT: It is with that understanding that you offer the stipulation?

"MR. BURLESON: Yes, sir, we do understand the Court would make all the jurors available to us, and we will waive that, in light of the stipulation.

"THE COURT: Are you satisfied with the manner in which you had an opportunity to interrogate the jurors?

"MR. BURLESON: 100 percent, yes, sir.

"THE COURT: All right."

The jury in the mail fraud case mentioned above returned its verdict at about 2:30 P. M., Friday, less than twenty-four hours after the above proceeding on Thursday afternoon.

tached no importance to it, and to the fact that about two weeks had passed since the deliberations and no juror dreamed that he would ever be called upon to remember the details of them. Mr. Teague's testimony indicates that he intended his remark to have a different meaning from that placed upon it by the other five jurors. Neither meaning would be harmful to the defendants. In making my findings, I am putting on the remark the construction that the listening jurors did, because the question to be decided is not the matter resting in the personal consciousness of Mr. Teague, but whether his statement had a possible prejudicial effect on the other jurors. With this explanation, I find the facts to be as stated in the following paragraphs.

The trial began on the morning of Monday, May 21, 1973. The evidence was concluded on the following Thursday afternoon. The case was submitted to the jury at about 12:45 P.M. on Friday. They selected their foreman, recessed for lunch, and began their deliberations at about 2:00 P.M. The verdicts were returned around 6:45 P.M.

The jury deliberated for almost an hour after it returned from lunch at 2:00 P.M. before a ballot was taken. On that vote, the jury stood eleven for guilty as to each defendant, with one woman member not committing herself either way. In the early stages of the discussion of the case that followed, she indicated that she was not sure that she understood the meaning of the term, "conspiracy". During the course of the attempt to explain what was meant by conspiracy, Mr. Teague told her he would illustrate it by an experience of his own. He told her that in 1959, when he was a very young man, he paid a fine of $125.00 for transporting beer and wine in a dry county; that he and two friends had gone from their homes in the dry county to purchase the beer and wine in another county which was wet; that the agreement was that he would provide the car and they would furnish the purchase money; that when the car was stopped in a dry county on their return trip, he agreed to claim full responsibility and pay the fine.[14] He stated that while he was the only one who was charged and fined, all three of them were guilty because their arrangement was a conspiracy.

The illustration given by Mr. Teague occurred around 3:00 P.M. It was almost four hours later before the jury reached a verdict. Two ballots were taken between the first and last ones. The vote on those two intervening ballots was the same as the first one. The jury took only one short recess of about fifteen minutes during their entire deliberations.

The woman juror who was so long in making up her mind was not identified at the hearing; but the fact that she was not one of those who testified was evident from the fact that all of the jurors were plainly referring to a juror who was not present when they mentioned the one who held up the verdict.

There is nothing to the claim that Mr. Teague's conviction disqualified him to serve as a juror. Copies of the information and judgment of conviction are in the record of this hearing. 28 U.S.C.A. § 1865(b)(5), provides that a person is disqualified to serve on a jury

14. One of the jurors friends had been previously fined on a similar offense. It was apparently felt that the fine would be heavier against him than against the juror who had not previously been fined. He could have been charged as a second offender, and his punishment would have been enhanced as provided in Art. 61, Vernon's Texas Penal Code which reads:
Art. 61. [1618] [1014] [818] Second and subsequent conviction for misdemeanor

If it be shown on the trial of a misdemeanor that the defendant has been once before convicted of the same offense, he shall on a second conviction receive double the punishment prescribed for such offense in ordinary cases, and upon a third or any subsequent conviction for the same offense, the punishment shall be increased so as not to exceed four times the penalty in ordinary cases.

in the federal court if he "has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year. . . ." The maximum possible punishment for transporting an alcoholic beverage in a dry county in Texas is a fine of not more than $1,000.-00, or imprisonment in the county jail for not more than one year, or both such fine and imprisonment.[15]

15. Copies of the information, the judgment of conviction and the case summary from the files of the case against Teague in the County Court of Scurry County, Texas, were offered in evidence on the present hearing. Xerox copies of the pertinent parts of those exhibits follow.

a. The charge stated in the information:

_John Carl Teague_, who is hereinafter called defendant, on or about the _12th_ day of _November_, A. D. 19_59_, and before making and filing of this Information, did then and there in a dry area, to-wit (') _Scurry_ County, State of Texas, unlawfully transport (•) _an alcoholic beverage to-wit: beer and wine_

b. The portion of the judgment of conviction showing the penalty:

It is therefore considered and adjudged by the Court, that the State of Texas do have and recover of the defendant _John Carl Teague_ the said fine of _$ 100.00_ Dollars and all costs of this prosecution, ~~and that~~ ~~the imprisonment in the county jail of Scurry County Texas for~~ ~~days~~ and the defendant being present in Court is placed in the custody of the Sheriff _____ who will commit h _im_ forthwith to the jail of said County ~~until said period of imprisonment is completed or~~ until said fine and costs are fully paid. It is further ordered by the Court that execution may issue against the property of said defendant for the amount of said fine and costs.

*Strike out portions not applying

_____
County Judge.

c. The prosecution's version of the facts shown in the case history.

PHYSICAL EVIDENCE:

48 - Qts Can Beer

56 - 4/5 Wine

3 - 4/5 I. W. Harper Whiskey

FACTS: Subject ran across 21st. And Ave. H. at a high rate of speed causing officers Clemons & Browning to get in pursute of him. Subject turned on Ave. R going North at a high rate of speed and the officers stoped subject at Ave. R. & 17th. St. Officer Clemons & Browning found in subject's posession the above quanity of alcholis beverages.

Reference to several provisions of the Penal Code are necessary to an understanding of the offense involved and the maximum possible term of imprisonment therefor. All acts perrtaining to alcoholic beverages in this State are regulated by the Texas Liquor Control Act, which is divided into two parts. Part II., Articles 667–1 through 667–33, Vernon's Texas Penal Code, deals with malt liquors. Part I., Article 666–1 through 666–58, relates to all other alcoholic beverages, but some of its provisions cover acts involving beer. The following is relevant to the question here:

1. Pertinent terms defined.

Art. 666—3a. Definitions

The following definitions of words and terms shall apply as used in this Act:

(1) "Alcoholic Beverage" shall mean alcohol and any beverage containing more than one-half of one per cent ($\frac{1}{2}$ of 1%) of alcohol by volume which is capable of use for beverage purposes, either alone or when diluted.

(5) "Liquor" shall mean any alcoholic beverage containing alcohol in excess of four (4) per centum by weight, unless otherwise indicated. Proof that an alcoholic beverage is alcohol, spirits of wine, whiskey, liquor, wine, brandy, gin, rum, ale, malt liquor, tequila, mescal, habanero, or barreteago shall be prima-facie evidence that the same is liquor as herein defined.

Art. 667—1. Definitions

Where used in this Article unless expressly stated otherwise:

(b) The term "beer" means a malt beverage containing one-half of 1% ór more of alcohol by volume and not more than 4% of alcohol by weight, and shall not be inclusive of any beverage designated by label or otherwise by any other name than beer.

Art. 666—23. Dry and wet areas; definitions

Whenever the term "dry area" is used in this Act it shall mean and refer to all counties, justice precincts, incorporated cities or towns wherein the sale of alcoholic beverages had been prohibited by valid local option elections held under the laws of the State in force at the time of the taking effect of Section 20, Article XVI, Constitution of Texas in the year 1919. It likewise shall mean and refer to any such areas where sale of such alcoholic beverages shall be prohibited under the terms of this Act.

The term "wet area" shall mean and refer to all other areas of the State.

2. Possession and transportation in a dry area.

A person may possess alcoholic beverages in a dry area, and he may transport it from the place of purchase in a wet area to the place where he intends to use it in a dry area, as long as it is "for his own consumption". However, it is prima facie evidence that the possession and transportation are for the purpose of sale, and not for the person's own consumption, if a person has more than one quart of liquor or twenty-four bottles of beer having a capacity of 12 ounces each.

Art. 666—23a. Transportation from wet area to wet area; importation of liquor for personal use; stamps; hotels authorized to hold package store permits; evidence

(1) It is provided that any person who purchases alcoholic beverages *for his own consumption* may transport same from a place where the sale thereof is legal to a place where the possession thereof is legal.

(2) Possession of more than one quart of liquor in a dry area shall be prima facie evidence that it is possessed for the purpose of sale. As amended Acts 1937, 45th Leg., 1st C.S., p. 1760, ch. 13, § 9.

Article 667–25(b) provides:

(b) Possession by any person in any dry area of beer in any quantity exceeding twenty-four (24) bottles having a capacity of twelve (12) ounces each shall be prima facie evidence of possession for the purpose of sale in a dry area. Acts 1935, 44th Leg., 2nd C.S., p. 1795, ch. 467, Art. 2, § 25, added Acts 1937, 45th Leg., p. 1053, ch. 448, § 49.

Article 666–4(b), taken with the prima facie statutes making Teague's possession of more than a quart of wine or 24 bottles of beer having a capacity of 12 ounces each, is the basis for the offense charged. Art. 666–4(b) provides:

(b) It shall be unlawful for any person *in any dry area* to manufacture, distill, brew, sell, possess *for the purpose of sale*, import into this State, export from the State, *transport*, distribute, warehouse, store, solicit or take orders for, or for the purpose of sale to bottle, rectify, blend, treat, fortify, mix, or process any liquor, distilled spirits, whiskey, gin, brandy, *wine*, rum, *beer* or ale. Acts 1935, 44th Leg., 2nd C.S., p. 1795, ch. 467, Art. 1, § 4; Acts 1937, 45th Leg., p. 1053, ch. 448, § 5.

3. Penalty.

The penalty for the offense for which Teague was convicted is provided in Art. 666–41.

Art. 666—41. Penalty for violations of act

The defendants claim that even though the juror Teague was not disqualified by his prior conviction, the discussion of it during the deliberations requires that a new trial be granted. The Court is of the opinion that the discussion resulted in no injury whatever to the defendants.

There is a serious question about whether the defendants are entitled to have this testimony considered, once it is settled that the conviction was not such as to disqualify the juror. The federal courts have drawn a distinction between cases where the alleged misconduct is in regard to its deliberations and method of reaching a verdict, and those based upon "the probable or possible effect upon the jury of extraneous matters which by outside influences have been brought to their attention." Fort Worth & Denver Ry. Co. v. Thompson 5 Cir., 216 F.2d 790, 793 (1954). See also Mattox v. United States, McDonald v. Pless, Clark v. United States, Complete Auto Transit, Inc. v. Wayne Broyles Eng. Co., United States v. Hohn, and Northern Pac. Ry. Co. v. Mely, all supra, footnote 12, and Young v. United States, 10 Cir., 163 F.2d 187 (1947); United States v. 4925 Acres of Land, 5 Cir., 143 F.2d 127 (1944); Morgan v. Sun Oil Co., 5 Cir., 109 F.2d 178 (1940), cert. den., 310 U.S. 640, 60 S.Ct. 1086, 84 L. Ed. 1408; Eagle Lake Improvement Co. v. United States, 5 Cir., 160 F.2d 182 (1947), cert. den., 332 U.S. 762, 68 S.Ct. 64, 92 L.Ed. 347; Jayson v. United States, 5 Cir. 294 F.2d 808 (1961); Privett v. Dixon, 5 Cir., 393 F.2d 479

(1968). The following quotations are taken from the cases just cited:

". . . . There is no evidence that anything complained of was caused by appellee or by the acts or interference of anyone not a member of the jury. *The only evidence adduced was with reference to chance remarks made by jurors to one another while considering the case.* This attempt of appellants to thus impeach the verdict of the jury was improper and without sanction in federal practice. The court properly overruled the motion for a new trial based on the alleged misconduct." (Emphasis added). 160 F.2d, at 184.

"They next contend that the court below abused its discretion in refusing to grant a new trial because of the alleged acts of misconduct on the part of the jury. We do not think so. Most of the acts complained of took place in the jury room and related largely to discussions between the jurors. The court below will be presumed to have considered all of the affidavits and to have applied correct legal standards in passing upon their admissibility and weight." 294 F.2d, at 810.

The outside influences mentioned in the cases have usually been contacts between jurors and persons not on the jury and the injection of prejudicial newspaper articles into the jury room.

The Court has, however, as it did in regard to permitting the interrogation of the jurors by defense counsel

---

1. Articles 666–1 et seq., 667–1 et seq.

Any person who violates any provision of this Act [1] for which a specific penalty is not provided shall be deemed guilty of a *misdemeanor*, and upon conviction be punished by fine of not less than One Hundred ($100.00) Dollars and *not more than One Thousand ($1,000.00) Dollars*, or by *imprisonment in the county jail for not more than one year*, or by both such fine and imprisonment.

The term "specific penalty" as used in this Section means and refers only to a penalty which might be imposed as a result of a criminal prosecution. Acts 1935, 44th Leg., 2nd C.S., p. 1795, ch. 467, Art. 1, § 41; Acts 1937, 45th Leg., p. 1053, ch. 448, § 39; Acts 1943, 48th Leg., p. 509, ch. 325, § 8.

There are few specific penalties provided for in the Act. They are for such serious matters as forgery of state liquor stamps and knowingly making false statements on applications for licenses. That kind of an offense is a felony. The one here involved is only a misdemeanor.

All this shows that the offense in question was a misdemeanor for which the maximum possible imprisonment was a jail term for not more than one year.

in advance of the filing of the motion for new trial, decided to meet the question on its merits. After having considered the evidence, the Court concludes that there is no basis whatever for granting a new trial on the ground of jury misconduct.

The strictness of the federal rule about inquiring into misconduct of the jury based on remarks of jurors to each other during deliberations has brought about a scarcity of federal cases on that subject. Klimes v. United States, 105 U.S.App.D.C. 23, 263 F.2d 273 (1959), is one of the few cases found on the point. In that case, the jury misconduct charged was:

> ". . . . One of the jurors said [during deliberations] yes this was like the pilferage case we [some of the jurors] had [when serving on another panel] concerning the YMCA."

Chief Justice Burger, who was then on the Circuit Court, wrote the opinion and disposed of the matter on its merits. Wigmore, Evidence, # 2349 (3d ed. 1940) was cited as authority for the holding that the ground alleged, if taken as true, did not warrant a new trial. The following is quoted from the opinion:

> "Wigmore sets out as elements which will *not* affect a verdict:
>
> (1) that a juror was influenced by an improper remark of a fellow juror:" Italics are by the Court.

Just how little there is to this contention is shown by the following quotation from United States v. Ragland, 2 Cir., 375 F.2d 471, 476, footnote 2 (1967):

> . . . . . A juror is not disqualified merely because he has previously heard a similar case arising out of a separate and distinct set of circumstances even though the offenses charged in the cases are the same offenses, and the same witnesses testifying in the second case also testified in the earlier one. Casias v. United States, supra, at 615; Harbold v. United States, supra at 205; Cwach v. United States, 212 F.2d 520, 529 (8

Cir. 1954); Belvin v. United States, 12 F.2d 548, 550 (4 Cir.) cert. denied, 273 U.S. 706, 47 S.Ct. 98, 71 L.Ed. 850 (1926); Wilkes v. United States, 291 F. 988, 990 (6 Cir. 1923), cert. denied, 263 U.S. 719, 44 S.Ct. 181, 68 L.Ed. 523 (1924); Haussener v. United States, 4 F.2d 884, 886 (8 Cir. 1925); cf. United States v. Cooper, 332 F.2d 790, 791 (3 Cir. 1964)."

Judge Waterman stated that the only criticism of the rule in the federal courts had been in a dissenting opinion in Casias v. United States, cited in the above quotation. The criticism there was that the witnesses were the same in the first and second cases on which the jurors sat; and that the jurors had necessarily made a decision in the first case as to the credibility of the witnesses. That has no application here.

If a juror is not disqualified to sit on several cases involving the same type of offense, it is difficult to see how the chance remark of a juror in this case about his own misdemeanor conviction 14 years before could be said to have resulted in injury to the defendants. There was no comparison between the offense for which he was convicted and the one for which the defendants were being tried. It is hardly conceivable that a person would put a misdemeanor charge of transportation of wine and beer in a dry area in the same class with cocaine peddling on a big scale, especially where the dope was being piped into schools.

Mr. Teague gave the account of his conviction merely as an illustration of the meaning of the term "conspiracy". There was nothing about it that was inconsistent with the court's charge. He made no attempt to relate it to the conduct of the defendants. It was not inflammatory in nature. The facts that it was made about three and a half hours before the jury agreed upon a verdict, and that the juror to whom Mr. Teague was talking did not change her position on the two ballots taken during that three and a half hours, are satisfactory proof that it was not what influenced

the uncertain juror to vote "guilty" on the last ballot taken near 6:45 P.M.

For the reasons stated, there is no merit in the claim that a new trial should be granted on account of misconduct of the jury.

*Admission in Evidence of Telephone Directory*

The ruling admitting in evidence the Laredo, Texas telephone directory is attacked in the eighth ground of the motion, which reads:

"8. The judge during trial erred in admitting into evidence the Laredo telephone book because the contents had not been sufficiently proved to be correct and accurate."

Over the objection of the defendants, the Court admitted in evidence the official telephone directory of Laredo, Texas, which also contained a directory of telephones in Nuevo Laredo, the city just across the border in Mexico. It was admitted for the purpose of showing the telephone listing for the Custom House in Nuevo Laredo (203–2175) and for Martinez (203–5459), over whom the United States had never acquired jurisdiction, primarily because of the fact that he was in Mexican custody in Nuevo Laredo on some dope peddling charges.

The evidence established that such telephone numbers were used in the commission of the offense charged. The records of the Laredo telephone office showed a number of calls to those telephone numbers by the defendant, Lerma.

The witness, Jerry Wallace, Security Officer of Southwestern Bell Telephone Company, testified that the directory admitted in evidence was the telephone directory published and circulated by his company for use of the public in ascertaining the telephone listings in Laredo, Texas and Nuevo Laredo, Mexico. His testimony satisfied the Court that the telephone book was the one in use by the public during the period here involved, and that it was accurate and trustworthy. The testimony of Eloy Garcia supported its trustworthiness. Counsel for defendants got out of him the admission that there might possibly be "some mistakes" in the directory, and that is the basis of their contention that it was inadmissible. The Court was of the opinion that that point went to its weight rather than its admissibility. If the only documentary records ever admitted were the ones the testimony showed could not possibly contain a mistake, very few of them would ever get in evidence.

■ The directory was admissible under the Business Records Act. 28 U.S. C. § 1732. City directories have been held to be admissible to show listings. Williams v. Campbell Soup Co., D.C.Mo., 80 F.Supp. 865 (1948); Peoples National Bank v. Manos Brothers, 226 S.C. 257, 84 S.E.2d 857, 872 (1954); Johnson v. Cousins, S.Ct.Colo., 135 P.2d 1021 (1943). A telephone directory is much more trustworthy to show listings than a city directory, because the person listed in the telephone directory has substantially more participation in furnishing the information than one listed in a city directory. A person cannot be listed in a telephone directory unless he applies for and is granted a telephone. On the other hand, a person is listed in a city directory whether he wants to be or not. If he is available at the time information is being compiled for the publication of the directory, the pertinent information may be obtained from him. If he is away at the time, the solicitor gets the information from the most convenient source. There are very few documents more generally and implicitly relied upon by the public than the telephone directory.

■ The directory was admissible even though it was hearsay. The recent case of Chambers v. Mississippi, 410 U.S. 284, 298, 93 S.Ct. 1038, 1047, 35 L. Ed.2d 297, 311 (1973), says: ". . . A number of exceptions have been developed over the years to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compen-

sate for the absence of the oath and opportunity for cross-examination. . . ." Its admission did not violate the defendants' right of confrontation. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). They had adequate opportunity to test its reliability by cross-examination of the witness Wallace.

While I think there is no question about the admissibility of the directory, its admission, even if erroneous, was not prejudicial in view of the other testimony. The record has not been prepared; but if this case is appealed, it can be given with proper references to the record.

### Constitutionality of Conspiracy Statute

██ The defendants claim that the statute (21 U.S.C. § 846) under which they were convicted is unconstitutional. That statute makes it an offense to conspire to commit any offense defined in Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970.

21 U.S.C. § 846, along with other provisions relating to offenses created by the Act, was held to be constitutional in United States v. Lopez, 5 Cir., 459 F.2d 949 (1972). 18 U.S.C. § 371, the general conspiracy statute, was declared constitutional in United States v. Edwards, 5 Cir., 458 F.2d 875. The reasons that would support a holding of constitutionality of the general conspiracy statute would uphold the validity of the conspiracy statute under which these defendants were convicted.

### Other Questions

The other questions dealing with sufficiency of the indictment and of the evidence do not warrant discussion. If the defendants brief them on appeal, the government can answer them adequately in its brief.

An order will be entered overruling the motion for new trial.