UNITED STATES of America,
Plaintiff-Appellee,

v.

David M. DAVILA and Robert M.
Jacques, Defendants-Appellants.

No. 82–1395.

United States Court of Appeals,
Fifth Circuit.

April 25, 1983.
Rehearing Denied May 23, 1983.

John B. Luscombe, Jr., El Paso, Tex., for Davila.

John A. Langford, El Paso, Tex., for Jacques.

William R. Yeomans, Wm. Bradford Reynolds, Attys., Dept. of Justice, Appellate Sect., Civil Rights Div., Washington, D.C., for plaintiff-appellee.

Before POLITZ and JOLLY, Circuit Judges, and HUNTER *, District Judge.

\* District Judge of the Western District of Louisiana, sitting by designation.

1. 18 U.S.C. § 371 states, in pertinent part:
   If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy each [shall be guilty of an offense against the United States].

2. 18 U.S.C. § 242 states, in part:
   Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . [shall be guilty of an offense against the United States].

EDWIN F. HUNTER, District Judge:

Defendants were officers of the United States Border Patrol. On January 5, 1982, they were charged by indictment under Count I of conspiring to deprive Alicia Palmer (nee Ortiz) and Norma Munoz-Pro (illegal aliens) of their liberty by coercing sexual favors from them;[1] Count II charged Davila of sexually abusing Alicia Palmer; and Count III charged Jacques of sexually abusing Norma Munoz-Pro.[2] A superseding indictment, Count IV, was filed March 17, 1982, charging defendants with violating 18 U.S.C. Sections 2 and 1503[3] by acting together to impede the due administration of justice by delivering to their counsel falsified records and causing their attorney to transmit these records to attorneys for the United States. Counts V and VI allege that "Davila . . . did, for the purpose of defrauding the United States, falsely make, alter and forge a public record."[4]

The trial commenced on July 14, 1982 and the jury returned its verdict of guilty against defendants on all counts on July 22, 1982.

Defendants argue the government presented insufficient evidence to sustain their conviction, and challenge three rulings made by the district court. We conclude that these contentions are without merit. We affirm the convictions on all counts.

3. 18 U.S.C. § 2 states:
   Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.
   18 U.S.C. § 1503 provides, in part:
   Whoever corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct or impede, the due administration of justice [shall be guilty of an offense against the United States].

4. 18 U.S.C. § 494 states in part:
   Whoever falsely makes, alters, forges, or counterfeits any . . . public record . . . or other writing for the purpose of defrauding the United States . . . [shall be guilty of an offense against the United States].

## FACTUAL BACKGROUND

The Government's evidence demonstrated that on the morning of October 18, 1980, defendants stopped an automobile containing two privates in the United States Army—William Ward and Warren Palmer—and the two Mexican women who had entered the country illegally. Defendants retained the two women in their custody and exacted a price for their liberty. The price which they exacted was sexual intercourse. This occurred at an apartment owned by defendant Davila. Alicia Ortiz related to her fiance, Warren Palmer, what had occurred. He filed a complaint with the Immigration and Naturalization Service. This led to the indictment of January 5, 1982. Subsequently, defendants presented documents to their attorney purporting to demonstrate that at the approximate time of the above incident, two other female aliens (Hernandez and Reyna) had been apprehended and arrested by them as a result of illegal entry into the United States. These documents were furnished to the Government on February 25, 1982, and as a result of the discovery of this prospective evidence, both the Government and defense moved for a continuance which was granted so that the authenticity and the authorship of these documents could be examined. Subsequent analysis revealed that the documents had been fabricated and were not authentic. The originals in El Paso were primarily in David Davila's handwriting and contained his fingerprints. A superseding indictment, added to the original three counts, charged obstruction of justice against both defendants and two counts of forgery against Davila.

## SUFFICIENCY OF THE EVIDENCE

■ In considering appellants' argument that their motions for judgment of acquittal should have been granted, we must review that evidence in the light most favorable to the Government. The critical inquiry on appellate review must be whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Jones,* 693 F.2d 343, 345 (5th Cir.1982). This standard of review applies to any criminal conviction, including conspiracies. *United States v. Malatesta,* 590 F.2d 1379 (5th Cir.1979), *en banc, cert. denied* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

■ We address the evidence as it relates to Counts I, II and III. Defendants insist that "there is no identity of the defendants as being the Border Patrol Agents who sexually abused and conspired to deprive Ortiz and Munoz of their civil rights and what little identity there is, is so scant as to be worthless." We can not agree. The two women were able to identify the defendants from photographic displays. William Ward identified them (in court) as the agents who had stopped their car. He had also identified both defendants from photographic spreads.

Defendants suggest that the photograph displays shown to the complaining witnesses were "blatantly suggestive" because they did not contain pictures of anglo, black or oriental agents. A display containing agents with racial characteristics different from the defendants' would, of course, have been more, rather than less, suggestive. Moreover, unlike the cases cited by the defendants, there was substantial evidence beyond the eyewitness identifications to link the defendants to the sexual abuse. On the morning in question, the defendants were assigned to watch the border around the Bridge of the Americas, the area in which the car containing the two soldiers and the two women was stopped. The green Gremlin driven by Warren Palmer was recorded as entering the United States at the Bridge of the Americas entry point at 4:22 A.M. The Border Patrol radio tape revealed that the defendants, Davila and Jacques, radioed at 4:25 A.M. that they had stopped the green Gremlin driven by Palmer. Moreover, the two victims of the sexual abuse were able to identify the outside of the apartment to which they were taken. The apartment was leased to Davila who, on the morning of the assaults, opened the door

with a key. Norma Munoz-Pro, without reentering the apartment, described the interior in detail. Her description was corroborated by Maria Davila, defendant Davila's wife, who had been out of town on the morning of the assaults. The high degree of corroboration in the testimony of the soldiers and the women regarding the events surrounding the stop and the sexual assaults was more than sufficient to allow a reasonable jury to identify the defendants as the perpetrators.

## THE FALSIFIED RECORDS

Defendants challenge the sufficiency of the evidence to sustain the jury verdict that they endeavored to impede the administration of justice by causing falsified records to be delivered to attorneys for the United States (Count IV). The transcript reveals that defendants testified before the grand jury that they were unable to recall stopping the car driven by Palmer, nor could they remember detaining the two women. A thorough search of the Border Patrol Records produced only one arrest by defendants between midnight and 8:00 A.M. on October 18, 1980. Both categorically denied taking the women to the apartment. Both stated under oath that they have never released, without processing, a person whom they had found to be in this country illegally. Yet, they had no explanation for the fact that there had been a documented stop, and no processing. David Davila eventually, in the course of his grand jury testimony, suggested that the women may have used aliases. Three days after their indictment defendants presented their attorney, Mr. Harris, with several documents. They told Mr. Harris that Exhibit Q–1, the arrest record of Marta Hernandez, and Q–3, the arrest record of Marta Ramirez, were authentic records of aliens they had apprehended on October 18, 1980. Defendants did not object when Mr. Harris told them that he would hand over the documents to the United States Attorney.

The United States immediately initiated a search for the originals and all copies of the documents. The search revealed that the original and the carbon copies of the documents, which were stored in unsecured files at the Border Patrol headquarters in El Paso, attributed the arrest of Marta Garcia Ramirez and Marta Galindo Hernandez to Agents Davila and Jacques, but the Border Patrol arrest log which was compiled by copying information directly from arrest reports attributed these unrelated arrests to two other officers, Carranza and Boyett. Carranza identified his handwriting on a copy retrieved from Washington. Subsequent analysis revealed that the originals and copies found in El Paso were primarily in David Davila's handwriting, carried his fingerprints, were fabricated and not authentic. A handwriting expert testified that the signature of "Marta Garcia R" was a bogus signature intended to appear to be a simulated signature copying the handwriting of Alicia Ortiz de Palmer.

Viewing the evidence presented and the inferences that may be drawn from it in the light most favorable to the Government (see, e.g., *Glasser v. United States,* 315 U.S. 68, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)), we conclude that it was sufficient to allow a reasonable jury to find that defendants, with knowledge that they were under indictment for violations of 18 U.S.C. §§ 242 and 371, conspired with each other to obstruct the "due administration" under 18 U.S.C. § 1503. *United States v. Howard,* 569 F.2d 1331 (5th Cir.1978), *cert. denied* 439 U.S. 834, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978).

Defendant Davila also complains of the alleged insufficiency of evidence to support his conviction under Counts V and VI. We reject this contention. The copies of the relevant documents (found in El Paso) were primarily in his handwriting, carried his fingerprints, and first appeared in his and Jacques' possession.

We conclude that the record contains overwhelming evidence of guilt. The government produced abundant testimony and documentary evidence that defendants had the opportunity to agree, did in fact agree, and then acted together to obtain coerced sexual intercourse from Norma Mu-

noz-Pro and Alicia Ortiz in exchange for their liberty and the liberty of the soldiers. The evidence is likewise convincing that defendants thereafter devised a scheme to conceal their illegal treatment of these women by tampering with documents and fabricating evidence.

## THE CHALLENGED RULINGS

Appellants request our review of certain rulings that they contend constitute reversible error.

First is the contention that the trial court erred by denying its motion to postpone the trial for a week is premised on a faulty view of the Government's obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the Jencks Act, 18 U.S.C. § 3500. The statements of the four witnesses upon which the defendants based their request for a continuance were not *Brady* material and were timely furnished to the defendants. The statements fall under the Jencks Act, 18 U.S.C. § 3500(e)(1).[5]

■ The statements in question were voluntarily provided to defendants by the United States on Saturday, June 12, 1983, two days before the jury was selected on June 14, 1982. This disclosure exceeds the timeliness requirement of the Jencks Act. A motion for a continuance falls within the sound discretion of the trial court, and the ruling on such a motion should not be disturbed, absent abuse of discretion. *United States v. Jimenez-Diaz,* 659 F.2d 562, 567 (5th Cir.1981). To establish abuse of discretion, appellants must show that the denial of the motion seriously prejudiced them. *United States v. Cross,* 638 F.2d 1375 at 1378 (5th Cir.1981). We are unable to discern any prejudice. The district court properly exercised its broad discretion in denying the motion for a continuance.

Secondly, defendants assign as error the trial court's granting of the Government's Motion in Limine, excluding evidence of the complaining witnesses' prior sexual activities, i.e., engaging in prostitution. They argue that this information could have been used to attack the credibility of these witnesses. In addition, they assert that evidence tending to show that Munoz and Ortiz were prostitutes would support the defense theory that they falsely accused defendants as an excuse for not having earned any money that night.

Rule 403 of the Federal Rules of Evidence provides that:

> ... evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...

And the Advisory Committee's Note to Rule 403 states:

> Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission.

■ Pursuant to those provisions, when a Rule 403 problem arises, the trial court should carefully weigh the probative value of the proffered testimony against its possible prejudicial effects. In our view, whatever probative value lay in the evidence as to possible prostitution was miniscule and the potential for confusion was substantial. We think the district court acted properly in excluding this evidence. *United States v. Williams,* 613 F.2d at 560 (5th Cir.1980); *United States v. Johnson,* 558 F.2d 744, 746–747 (5th Cir.1977), *cert. denied* 434 U.S. 1065, 98 S.Ct. 1241, 55 L.Ed.2d 766 (1978).

## POST–VERDICT QUESTIONING OF JURORS

Appellants' remaining issue on appeal is that it was error for the trial judge to refuse their request to interview the jurors after the verdict. The district court acted pursuant to Local Rule 500–2, which prohibited questioning of jurors with regard to their deliberations or verdict, except upon

---

**5.** 18 U.S.C. § 3500(e)(1) includes as material falling within the Jencks Act:

a written statement made by [a Government witness] and signed or otherwise adopted or approved by him.

leave of the court for good cause shown.[6] The defendants' principal contention appears to be that the acquittal of John Hinckley, Jr. was announced while the jury was deliberating in this case and it was necessary to examine the jurors to determine whether they were influenced by that verdict. Defendants express this facet of their argument in this language:

"In this case, while the jury deliberated on June 21, 1980, news of the John Hinckley, Jr.'s acquittal became known. The entire criminal justice system was immediately under attack. What effect this extraneous matter may have had upon this jury's deliberations we shall never know—nor with the court's refusal to permit the jurors to be questioned will we ever know what other outside influence independent of the facts in evidence entered with the jury's deliberations."

The district court denied the motion, finding that

"The motion fails to show good cause for granting the relief sought. The jury deliberations in this case consumed less than four hours after a trial lasting six days. The evidence of Defendants' guilt was strong, and certainly more than sufficient to prove their guilt beyond a reasonable doubt. Defendants have not even hinted at any reason to believe the jury engaged in any misconduct, or based their verdict upon matters outside the record or other improper considerations."

■ The prevention of fishing expeditions in search of information with which to impeach jury verdicts is a principal purpose of the rule. *United States v. Riley,* 544 F.2d 237, 241 (5th Cir.1976), *cert. denied* 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d 777 (1977). Indeed, the rule relied upon by the district court is a codification of the historical practice in federal courts in which "interrogations of jurors have not been favored ... except where there is some showing of illegal or prejudicial intrusion into the jury process." *Id.* at 242; *In re Express-News Corporation and Cecil Clift,* 695 F.2d 807 (5th Cir.1982); *O'Rear v. Fruehauf Corp.,* 554 F.2d 1304, 1309–1310 (5th Cir. 1977); *King v. United States,* 576 F.2d 432, 438 (2nd Cir.1978), *cert. denied* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *United States v. Franks,* 511 F.2d 25, 38 (2nd Cir. 1975), *cert. denied* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975); *cf.* Federal Rules of Evidence, Rule 606(b). The policies supporting this rule are strong:

"... to avoid harassment of jurors, inhibition of deliberation in the jury room, a deluge of post-verdict applications mostly without real merit, and an increase in opportunities for jury tampering; it is also to prevent jury verdicts from being made more uncertain."

*King v. United States, supra,* 576 F.2d at 438.

■ As this Court recently reaffirmed, *In Re Express-News Corporation and Cecil Clift,* 695 F.2d at 810, in quoting from *O'Rear v. Fruehauf, supra,* 554 F.2d 1304,

Such interviews would "denigrate jury trials by afterwards ransacking the jurors in search of some ground ... for a new trial."[7]

Defendants failed to make any preliminary showing of misconduct. The motion sought simply to discover what happened in the jury's deliberations in the hope of uncovering an impropriety. This, the district judge refused to sanction. We believe he acted properly in denying defendants' motion.[8]

---

**6.** Rule 500–2 states:

No attorney or any party to an action or any other person shall himself or through any investigator or other person acting for him interview, examine or question any juror, relative, friend or associate thereof either during the pendency of the trial or with respect to the deliberations or verdict of the jury in any action, except on leave of court granted upon good cause shown.

**7.** *Cf. In re Express-News Corp.,* 695 F.2d 807, 810 (5th Cir.1982) (policy considerations different where press, not parties, seeks to interview jurors after trial).

**8.** The vindication of the public interest in protecting jurors after the discharge of their duties has been a troublesome problem for the judiciary. A valid argument may be made that any post-trial questioning of jurors (for the purpose of impeaching the verdict) should be conducted

*Wilkerson v. Amco Corporation,* 703 F.2d 184 (5th Cir.1983).

For the reasons stated, we reject the grounds of error raised by defendants, and affirm their convictions.

AFFIRMED.

under the strict supervision and control of the court, with inquiry restricted to those matters found by the court as both relevant and proper under Federal Rules of Evidence 606(b), which reads:

> Upon an inquiry into the validity of a verdict . . . a juror may not testify as to any matter or statement occurring during the course of the jury's deliberation or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict . . . or concerning his mental processes in connection therewith, except a juror may testify on the question whether extraneous prejudicial information

was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror . . .

*King v. United States,* 576 F.2d 432 at 439 (2nd Cir.1978); *U.S. v. Brasco,* 516 F.2d 816, 819 fn. 4, *cert. denied* 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975). See also *Miller v. United States,* 403 F.2d 77, 81–84 (2nd Cir.1968); *United States v. Driscoll,* 276 F.Supp. 333 (S.D.N.Y. 1967, McLean, Jr.); *United States v. Sanchez,* 380 F.Supp. 1260, 1265–66 (N.D.Tex.1973, Brewster, J.); *affirmed* 508 F.2d 388 (5th Cir. 1975).