**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Arturo Jaime Lerma SANCHEZ and**
**Carlos Guillermo Salinas, Jr.,**
**Defendants-Appellants.**

**No. 73–2737.**

United States Court of Appeals,
Fifth Circuit.

Feb. 24, 1975.
Rehearing Denied April 4, 1975.

Phil Burleson, Dallas, Tex., for Sanchez.

Michael P. Gibson, Dallas, Tex., William C. Wright, Laredo, Tex., for Salinas.

Frank D. McCown, U. S. Atty., W. E. Smith, Alex H. McGlinchey, Asst. U. S. Attys., Fort Worth, Tex., for plaintiff-appellee.

Before BROWN, Chief Judge, and GODBOLD and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The appellants, Arturo Jaime Lerma Sanchez (Lerma) and Carlos Guillermo Salinas, Jr. (Salinas) were tried and found guilty before a jury at Abilene, Texas, in the Northern District of Texas, on May 21–25, 1973 under an indictment returned by a Northern District grand jury in the Fort Worth Division of that court. The indictment,[1] returned April 24, 1973 charged the two appellants, in Count 1, together with eleven co-defendants, with conspiracy, Title 21, U.S.C. § 846, to distribute cocaine, a narcotic drug and a Schedule II controlled substance, to persons in the Arlington-Fort Worth-Dallas, Texas area, and in Overland Park, Kansas in violation of Title 21, U.S.C. § 841(a)(1). Only the two appellants went to trial. Ten co-defendants had previously plead guilty to one or more counts of the indictment. One co-defendant, Manuel Sandoval Martinez (Martinez) was then under arrest and in jail in the Republic of Mexico and unavailable for trial. Count 1, the conspiracy count was the only count of the six-count indictment naming Lerma and Salinas, neither of whom was mentioned in any of the ten overt acts alleged in Count 1. Counts 2, 3, 4, 5 and 6 dealt with related activities of other defendants none of whom went to trial. Upon conviction and after denial of post-trial motions (following an evidentiary hear-

---

1. The indictment under which appellant's trial was held superseded a similar indictment returned April 4, 1973. Reindictment was made necessary when it was found that Lerma was erroneously named in the first indictment as Francisco Lerma. This actually was the name of Lerma's brother. The indictments were identical in all other respects.

ing),[2] Lerma and Salinas were each sentenced to fifteen years confinement to be followed by a special parole term of three years. This appeal followed. We affirm.

The principal grounds of error urged by Salinas are: (1) abuse of discretion by the trial court in denying a transfer under Rule 21(b), F.R.Crim.P. from the Northern District of Texas to the Laredo Division of the Southern District of Texas; (2) violation of his Sixth Amendment rights by the denial in part of his motion for Bill of Particulars and the failure of the trial court to require the government to furnish witness statements and other discovery earlier than the morning before the trial, and (3) the sentence to the maximum statutory confinement period of fifteen years was cruel and unusual punishment, in violation of the Eighth Amendment, in view of Salinas' youth, his prior unblemished record, and his honorable service in the Vietnam war.

Lerma advances the same grounds of appeal as those urged by Salinas except the question raised as to length of sentence, and additionally asserts that the evidence was insufficient to prove his participation in the conspiracy.

## I   The Evidence

In view of Lerma's separate claim of insufficiency of the evidence we must state the evidence in some detail.

The government's case was built around the testimony of an indicted co-defendant and co-conspirator, Rodolfo Serna Laurel, Jr. (Laurel). The jury was entitled to find the following facts which emerged from his testimony and that of other indicted co-defendants, principally Arturo Trevino Guevara (Guevera) and Peter Harrison Walker (Walker), together with the testimony of the undercover agents who worked on the case.

Laurel had lived in Laredo, Texas the greater part of his 22 years, but was living in Corpus Christi during most of the critical period involved, from Novem-

ber, 1972 through February, 1973. He and Salinas, also a Laredo native, were old acquaintances, Salinas being related to Laurel's aunt. He first met Lerma in November, 1972. At that time Salinas approached Laurel in Laredo and asked if he had connections for cocaine. Laurel said he would see if connections were available and met with Salinas later in November at the Laredo home of Salinas' grandmother, on Victoria Street, where Salinas shared an upstairs apartment with his brother, Jorge. Lerma came in later and the projected cocaine transaction was discussed by the three, Laurel, Salinas and Lerma. Laurel said he could place six ounces of cocaine, and a price of $600 per ounce net to Salinas and Lerma was indicated. Lerma left for a time. After his return, the discussion of a deal in cocaine continued. That evening the three went to a restaurant in Nuevo Laredo, Mexico where they met with Sandoval Martinez. Martinez was employed by a business next door to Lerma's brother, for whom Lerma worked for some years. Lerma and Martinez had been friends for ten or twelve years, according to Lerma. After a whispered conference between Martinez and Salinas, Salinas told Laurel he might get the six ounces of cocaine in December. Arrangements were made for Laurel to call and inquire whether Salinas had any shrimp (the agreed code word for cocaine). After several calls producing negative replies, Laurel was told that shrimp were available and he went from Corpus Christi to Laredo, to the Salinas apartment upstairs at the home of his grandmother, meeting Lerma and Salinas there. The six ounces of cocaine were delivered after being tested with Chlorox. Laurel sold the cocaine for $675 an ounce to Guevara, after calling Guevara at his residence in Austin, Texas. The cocaine was delivered by Laurel to Guevara in Corpus Christi on December 24, 1972. Walker accompanied Guevara to this meeting. Arrangements were made with Salinas in Lerma's presence for Laurel to sell three

---

2. The trial court's extensive opinion on motion for new trial is reported, United States of America v. Jaime Lerma Sanchez and Carlos

Guillermo Salinas, Jr., D.C.N.D.Tex., 1973, 380 F.Supp. 1260.

more ounces to Guevara for an advance of $1,000. The cocaine was procured by Laurel as before, from Salinas in Lerma's presence at Salinas' apartment, again after several telephone calls, some to Lerma, some to Salinas.

In early January, 1973, Guevara called Laurel asking for an additional pound of cocaine. After an exchange of telephone calls with Salinas, Laurel went to Laredo where Lerma and Salinas had 8 ounces of cocaine in a plastic bag and some Procaine on the table in the same apartment. The 8 ounces of cocaine were cut by admixing 8 ounces of Procaine to produce a pound. Laurel took this mixture to Corpus Christi where he delivered it to Guevara and Walker. During this time Salinas and Lerma both knew the identity of Laurel's buyer, Guevara, and approved delivery of cocaine to him on a credit basis. Thereafter, in late January, 1973, 2½ pounds of cocaine were procured by Laurel from the same source in a similar manner. During this visit, in the same Nuevo Laredo restaurant as before, the three met with Sandoval Martinez at which time Lerma conferred with Martinez in a voice too low for the others to hear. Laurel stayed several days in Laredo awaiting delivery of the two and one-half pounds of cocaine which was made by Salinas. Laurel delivered the cocaine to Guevara and Walker, who took 2 pounds to Fort Worth, where they delivered it to a co-defendant Larry Branum. Branum was arrested in Arlington, Texas, January 26, 1973 with this cocaine in his possession. Kathleen Branum, his wife, was arrested with him, as were the co-defendants Larry Speake, Richard Ray and Richard Garnett. A short time later Walker was caught in Kansas City, Kansas in possession of the remaining one-half pound of the original two and one-half pound consignment. When Laurel learned of the loss of the two pounds during Branum's arrest he notified first Lerma and later Salinas by telephone.

In an effort to recover from these serious business losses of large quantities of contraband, an additional two pounds of cocaine was procured by Sanchez and Lerma from their source (presumably Sandoval Martinez) and delivered to Laurel in February, 1973, by directing Laurel to a hole in the fence surrounding the home of the other grandmother of Salinas. Salinas had told Laurel he could pay off the cost of the last two pounds by "working and selling more cocaine." Laurel, in possession of this two pounds of cocaine was arrested at the Love Field Airport, Dallas, February 14, 1973 soon after deplaning from a Braniff International Air Lines Flight from Corpus Christi.

With Laurel's arrest on February 14, along with the apprehension of Walker and Guevara in Kansas City on February 2, 1973, the arrests of Larry Speake, Richard Ray and Richard Garnett, along with the two Branums in Arlington on January 26, 1973, and a sale of one ounce of cocaine to undercover BNDD agents on January 19, 1973 by the defendants Hattersley and Cowan, ten of the defendants were apprehended with cocaine in their possession. These arrests in possession of contraband [3] were the basis for the pleas of guilty by the ten defendants named. This in turn led to the tracing, by testimony and proof of telephone calls from Southwestern Bell Telephone Company records, of all of the various deliveries of cocaine from Salinas and Lerma at the 1904 Victoria Street, Laredo apartment of Salinas to Laurel. Agents arrested Lerma and Salinas at the grandmother's 1904 Victoria Street residence in Laredo on April 10, 1973. Initially, Salinas attempted to resist arrest by threatening the officers with a .357 Magnum pistol. Lerma was in possession of a .45 pistol at that time, both defendants had knives in their belts and there is testimony that both attempted to flee the scene.

The billing record of telephone calls from November 1972 through February 1973 included outgoing and incoming calls between Laurel's residence in Corpus Christi, (and after February 20, 1973 in Laredo), Salinas' residence and that of his grandmother in Laredo, Lerma's

---

3. Samples from each seizure were identified as cocaine by expert government testimony.

residence in Laredo, Sandoval Martinez's office in Nuevo Laredo, Arturo Guevara's Austin residence and that of his father in Laredo. Guevara's frequent telephone contacts with Branum's number in Fort Worth and with an Overland Park, Kansas number are also reflected in the billing records.

Of significance to this review of the evidence, the calls to and from Lerma's residence included two calls to Laurel's Corpus Christi number and one call from that number on December 18, 1972, two calls from Laurel's number on December 20, 1972, calls to Laurel's number on December 28, 1972 and January 7, 1973, one call from Laurel's number on January 23, 1973, and three calls from Guevara's Austin, Texas number on January 27, 1973.

Lerma's direct testimony, given through an interpreter, was principally to the effect that he was not guilty of taking part in the conspiracy laid in the indictment. As indicated, supra, he admitted on cross-examination a long, friendly association with Sandoval Martinez. He identified Laurel as a person met at Salinas' house, but denied making calls from his residence to Laurel in Corpus Christi. On re-direct he denied any connection with sales of cocaine to Laurel, stating that he understood Laurel's business with Sandoval Martinez to be in connection with the importation of curios, wrought iron and other artifacts from Mexico. He said he made telephone calls to Sandoval Martinez in this connection. He stated further that he and Salinas were involved in a business venture involving cantaloupes and other produce during the critical period from November, 1972 through February, 1973.

Although he was cross-examined about the numerous telephone calls, his acquaintance with other defendants and other matters,[4] the direct testimony of

Salinas was concerned with his military service upon graduation from high school from 1969 to 1972 (including a tour of duty in Vietnam), his job history following his military discharge, and his plans for further schooling. He stated flatly that he had no part in the alleged conspiracy.

Motions for judgments of acquittal by each defendant were denied at the close of the prosecution's case, and renewed and again denied at the close of all the evidence.

## II  Sufficiency of the Proof as to Lerma's Guilt

By his appeal Salinas does not question the sufficiency of the evidence to support his conviction. Sufficiency of the evidence as to him is one ground of the appeal of Lerma Sanchez, but we find that his contentions in this respect lack substance. The existence of the conspiracy to distribute cocaine and commission of numerous overt acts by co-conspirators to advance its purpose were fully established by the testimony of Laurel and the investigating agents. United States v. Falcone, 1940, 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128, 132; United States v. Menichino, 5 Cir. 1974, 497 F.2d 935; United States v. Perez, 5 Cir. 1973, 489 F.2d 51.

▮▮ It is the law of this circuit in conspiracy prosecutions that once the existence of an agreement or common scheme of conspiracy is shown—usually by inferences from relevant and competent circumstantial evidence—slight evidence is all that is required to connect a particular defendant with the conspiracy,[5] and further that once it appears that a particular defendant joined the conspiracy, the acts of his co-conspirators done in furtherance of the conspiracy are attributable to him and he is equally liable for them.[6]

---

4. Also on cross-examination, although he admitted acquaintance with Laurel and Lerma and long acquaintance with Guevara and Walker, Salinas denied knowing Sandoval Martinez.

5. United States v. Warner, 5 Cir. 1971, 441 F.2d 821, 830, cert. denied, 1972, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58; United States

v. Jones, 9 Cir. 1970, 425 F.2d 1048, 1051; United States v. Knight, 9 Cir. 1969, 416 F.2d 1181, 1184; Lopez v. United States, 5 Cir. 1969, 414 F.2d 909.

6. United States v. Warner, Note 5, supra, 441 F.2d at 830, Grimes v. United States, 5 Cir. 1967, 379 F.2d 791, 795, Hernandez v. United States, 9 Cir. 1962, 300 F.2d 114, 121.

While one's mere presence at the scene of a crime or mere association with persons involved in a criminal enterprise is not sufficient to prove participation in a conspiracy, United States v. Falcone, supra; United States v. Menichino, supra; United States v. Owen, 5 Cir. 1974, 492 F.2d 1100, 1103–1104, there is much more involved here than mere presence or occasional association. Lerma was consistently and routinely present at each critical juncture when arrangements were set up, when delivery was made, when the cocaine was tested or adulterated, and when payment was made. Telephone calls to and from his house to the telephone numbers of other conspirators coincided closely in time with the periods of increased activity surrounding each delivery of contraband to Laurel. The jury was entitled to view these events, coming as they did within a regularly recurring pattern, as more than coincidence, indeed as circumstances pointing with compelling force to Lerma's guilt, inconsistent with any other reasonable hypothesis. This was sufficient.

In United States v. Warner, 5 Cir. 1971, 441 F.2d 821, cert. denied, 1972, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58, Judge Wisdom stated the test under which we review the sufficiency of the evidence in cases of this nature:

> "[I]n criminal cases based on circumstantial evidence our task is to determine whether reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused's innocence." 441 F.2d at 825.

Accord, United States v. Velasquez, 5 Cir. 1974, 496 F.2d 1009; United States v. Amato, 5 Cir. 1974, 495 F.2d 545; United States v. Edwards, 5 Cir. 1974, 488 F.2d 1154; United States v. Fontenot, 5 Cir. 1973, 488 F.2d 315, 321, and numerous other cases.

Extensive review of the record leaves us firmly of the view that the government's case against Lerma fully met the rules announced in the cases cited.

### III   Denial of Transfer to the Southern District of Texas

Complaint is made by each of the appellants that the district court [7] abused its discretion in denying pre-trial motions filed in their behalf, seeking a transfer of their trial from the Abilene Division of the Northern District of Texas to the Laredo Division of the Southern District of Texas, where they resided and near where, they assert, most of their prospective defense witnesses resided. At the time these motions were heard, May 8, 1972, the only defendants whose cases were undisposed of were Lerma, Salinas and the missing defendant Sandoval Martinez. Each of the ten other defendants, principally residents of the Northern District of Texas in the Dallas-Fort Worth-Arlington area, had entered guilty pleas. Appended to each motion were affidavits of persons in or near Laredo, asserting that they had been asked to be either material witnesses or character witnesses for the defendants at trial, but could not afford to travel to Abilene. The affidavits also asserted on the basis of personal knowledge that the Lerma (or Salinas) family lacked the money to pay for the affiant's travel and subsistence expense to attend the scheduled Abilene trial. Both motions asserted the inconvenience and unnecessary expense to the defendants of a trial in Abilene, that the case as to the Northern District defendants was fully disposed of, and any acts and conduct charged on the part of Lerma and Salinas occurred in or near Laredo in the

---

7. The trial judge was Judge Brewster, then Chief Judge of the Northern District of Texas. The defendants, who were held in jail in default of posting $250,000 appearance bonds, agreed to the trial being moved from the Fort Worth Division, where the indictment was pending to the Abilene Division, where Judge Brewster was scheduled to sit in May, so as to permit a May 21, 1972 trial. While Judge Brewster was out of his district attending a Chief Judges' meeting, Judge Mahon on May 8 heard and passed upon numerous defense pre-trial motions, including the Motions to Transfer under Rule 21(b), F.R.Crim.P., discussed in the text (Part III) of this opinion, as well as the Motions for Bills of Particulars and Additional Discovery dealt with in the succeeding section of this opinion, titled "IV Rulings on Motions for Bills of Particulars and Other Discovery Motions."

Southern District. Neither motion nor any of the appended affidavits made any disclosure of the nature of the testimony expected from any of the several affiants.

The denial of these and other pre-trial motions by Judge Mahon was reviewed by Judge Brewster in his denial of motions of Lerma and Salinas for new trial, June 25, 1973.

We consider that the Motions to Transfer were properly denied, in an exercise of judicial discretion, for reasons sufficiently outlined by Judge Brewster in his June 25, 1973 opinion on Motions for New Trial:

> Venue in this case is determined by Rule 18, F.R.Crim.P., which provides that "the prosecution shall be had in a district in which the offense was committed."

▌ It has long been the law that in federal courts venue of prosecution for conspiracy lies in the district where the agreement was made or an overt act in furtherance of the conspiracy was committed. Hyde v. United States, 225 U.S. 347, 363, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); Miller v. Connally, 5 Cir., 354 F.2d 206, 208 (1965); Bellard v. United States, 5 Cir., 356 F.2d 437 (1966), cert. den., 385 U.S. 856, 87 S.Ct. 103, 17 L.Ed.2d 83; United States v. Williams, 5 Cir., 424 F.2d 344 (1970): Rule 18, F.R.Cr.P.

▌ The conspiracy here involved covered a wide territory from the Texas-Mexican border to Kansas City, Kansas. The government's evidence supported the theory that Lerma and Salinas were large suppliers near the ·top of a dope ring that could furnish cocaine in big lot quantities; that the defendant, Laurel, was one of their jobber outlets; that Laurel sold the cocaine obtained from them to wholesalers in the area of the University of Texas at Austin, Texas Christian University at Fort Worth, and University of Texas at Arlington.[1] While the

1. Arlington is in the same county as Fort Worth.

conspiracy "agreement" between Laurel, Lerma and Salinas may have been formed in the Laredo Division of the Southern District, several of the other defendants joined in the conspiracy in Fort Worth and Dallas. Many of the overt acts alleged in the indictment occurred in the Fort Worth-Dallas area, which is in the Northern District of Texas. Laurel was arrested at the Dallas airport as he was bringing in a large quantity of cocaine to complete a sale. The defendants, Branum and wife, Garnett, Speake and Ray were arrested in a motel room at Arlington, Texas, as they prepared to consummate a sale of two pounds of cocaine to government undercover agents for the wholesale price of $26,400.00.[2]

2. The $26,400.00 in currency was there and had been counted out by one of the defendants. The "street value" of this two pounds after cutting would have been over $250,000.00. It was slated for final distribution in the area of University of Texas at Arlington and of Texas Christian University. Branum was a recent dropout at U. T. A. at Arlington. Garnett, Speake and Ray were first stringers on the football team at Texas Christian University.

Under those circumstances, venue was properly laid in the Northern District of Texas.

While the indictment was returned into the Fort Worth Division, the case was tried in the Abilene Division.[3] At

3. Abilene is about 150 miles west of Fort Worth. Both Divisions are in the Northern District of Texas.

the time of the arraignments, there was not enough time left to get the case to trial in Fort Worth before Judge Brewster went to Abilene for the May docket there. Judge Mahon already had a full setting for May. These defendants were in jail, and Judge Brewster inquired of their counsel in open court if they wanted the case tried in Abilene where it could be reached in May. Counsel for Lerma and Salinas stated they consented to the trial in Abilene.[4]

4. He was probably happy to get the case away from Fort Worth, where Texas Christian University is located. Most defense lawyers would rather not have tried the case in the city where the three T. C. U. football players had been widely publicized.

■ What these defendants actually wanted was to get the case transferred to the city where they lived and possibly had some influence. Residence of the defendants is not a relevant factor. United States v. Valle, D.C.S.D.N.Y., 16 F.R.D. 519 (1955).[5]

5. In the Valle case, Judge Irving Kaufman said: ". . . . The Constitution and Rule 18 do not compel a trial in the place of residence of the defendants which in effect these defendants seek by the instant application." 380 F.Supp. at pp. 1262–1263.

### IV Ruling on Motions for Bills of Particulars and Other Discovery Motions

The next specification of error urged on appeal by both Lerma and Salinas, is stated by Lerma as follows:

"DID THE TRIAL COURT VIOLATE THE DEFENDANT'S SIXTH AMENDMENT RIGHTS BY VIRTUE OF ITS OVERRULING DEFENDANT'S MOTION TO QUASH THE INDICTMENT AND ITS DENIAL OF SUBSTANTIALLY ALL OF DEFENDANT'S TIMELY–FILED BILL OF PARTICULARS?"

Salinas' brief states the question in the following terms and adopts the arguments of Lerma's brief:

"DID THE TRIAL COURT VIOLATE THE DEFENDANT'S SIXTH AMENDMENT RIGHTS BY DENYING THIS DEFENDANT AND HIS CO–DEFENDANT THE RIGHT TO DISCOVERY?"

This section of Lerma's brief opens by asserting that Amendment VI guarantees that an accused in a criminal prosecution shall enjoy the right "to be informed of the nature and cause of the accusation against him," that this right is closely connected to the right under Amendment V to be held to answer for a crime only on a presentment or indictment of a grand jury, and that, taken together, Amendments V and VI in this respect mean that one must first of all be charged by indictment or information, and secondly, must be fully informed of

8. Judge Mahon after carefully considering the numerous discovery motions, granting them in part and alluding to the usual liberal rules

the charges against him by information, indictment or bill of particulars filed pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure.

■ The purpose of the protection of the amendments is correctly stated to be twofold: (1) to apprise the defendant of what he must be prepared to meet, and (2) in case other proceedings are taken against him for a similar offense, whether the records show with accuracy to what extent he may plead former acquittal or conviction, citing Russell v. United States, 1962, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240; Hagner v. United States, 1931, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861, 865; Cochran and Sayre v. United States, 1895, 157 U.S. 286, 290, 15 S.Ct. 628, 630, 39 L.Ed. 704, 705–706.

■ These postulates are, of course, abstractly unassailable. Undergirded by them, Lerma's argument is that Count I of the indictment, after charging formation of a conspiracy by the thirteen defendants in the language of the general conspiracy statute, Title 18, § 371, and outlining generally its objects in three paragraphs containing no names, and then alleged ten overt acts committed in the furtherance of the conspiracy, none by Lerma or Salinas, and none committed in Laredo, Texas. Lerma argues that the part played by these two defendants not being alluded to in the overt acts alleged or elsewhere in Count I of the indictment, they were entitled to be advised at least of the general nature of the proof relied on by the government to tie them into the conspiracy. The argument continues that it was error to refuse to require the government to make appropriate disclosure in response to the Motions for Bills of Particulars, for listing of names of witnesses, for disclosure of the name or names of informants and for discovery and inspection of tangible evidence.

These Motions for Bills of Particulars were mainly denied by Judge Mahon on May 8.[8] He did require some disclosure

for discovery in the Northern District of Texas as well as to the recognized exceptions made in cases where a question is present as

but not nearly all that was sought. Substantial disclosure was required by Judge Brewster on the morning the trial opened, Monday May 21. Some information, including the fact that Laurel would testify for the government, and a copy of his statement was furnished on the Sunday preceding trial.[9]

When the motion for new trial was argued before Judge Brewster, he asked defense counsel what he had failed to get that he thought he was entitled to. The only complaint was the lateness in furnishing Laurel's statement on the day before trial commenced, that is on Sunday May 20.

The record is not free from doubt, but we find nothing to show that the government was aware before Sunday May 20 that Laurel would testify as a government witness at trial. Such knowledge is contra-indicated by the fact that Laurel, Lerma and Salinas amicably occupied the same jail cell until shortly before trial.

At all events, the Jencks Act Statute, Title 18, U.S.Code § 3500 would not have entitled the appellants to a copy of Laurel's statement until the conclusion of his direct testimony at trial, as Judge Brewster correctly noted in the excerpt from his opinion, infra.

We think that the nature of this trial, with its evidence of far-flung dealing in several states for several months in large quantities of cocaine, involving numerous people, was such as to warrant its treatment as an exceptional case, in the informed discretion of the trial judge calling for limitations upon the time and the amount of pre-trial discovery. Prejudice in this connection, as to either defendant's rights, is not demonstrated on this appeal.

Once again, we turn to the extensive opinion filed by Judge Brewster in connection with the denial of the new trial motions for further explication of the sound reasons for the methods utilized by the district court in dealing with the numerous pre-trial discovery and bill of particulars motions:

> The other complaints directed at Judge Mahon's rulings relate to discovery. The practice in the Fort Worth Division to require the government to give much more information than the law requires is long established and rather well known in judicial circles. During his four years as United States Attorney here before going on the bench about a year ago, Judge Mahon followed that practice in criminal cases in this Court. He became a believer in it, and has established it in cases in his Court. The practice is very informal. The United States Attorney is required to show his entire file and make a complete disclosure to defense counsel in all but the most exceptional cases.[6] A limited

6. The exceptional cases are ones where witnesses will likely be endangered.

disclosure is made where the file also contains matters relating to investiga-

to disclosing an informer's identity or where the life or safety of witnesses might be endangered by complete disclosure, this case being treated as coming under the exception, stated (App. 200A):

> "All right. Of course, Counsel, your clients, from the standpoint of saying they don't know what they are charged with, your clients are charged with a conspiracy in connection with these nine other individuals and that it occurred in Texas during these particular dates and your clients will be able to advise with you as to what, if anything, they had to do in connection with any of these people on any dates during this period of time anywhere in Texas or in Kansas and prior to the time they testify you are going to be given any statements or summaries that they have at that time."

Alluding to the broad general discovery policy of his district, followed in this case to

the extent permissible under the recognized exceptions, Judge Mahon (a former United States Attorney) continued (App. 201A):

> "I am going to overrule the motion for a bill of particulars. Of course, the Government has answered and they will, of course, be giving you additional information at the time of trial. So I overrule the motion for more definite bill of particulars."

As noted in the text, all appropriate information was furnished prior to trial, although appellants complain that it was furnished so late as to be of limited value in trial preparations.

9. It was apparently the custom in the Northern District of Texas for out-of-town lawyers, both for the defense and for the government, to proceed to an outlying division point, such as Abilene, several days prior to an important trial and work weekends in preparation for the opening of trial.

tion of unrelated offenses,[7] or where

7. This frequently occurs where the informer is working on several cases during the same period. The reports of the government agents usually cover all the transactions on which they are working with the informer.

there is a question about whether the identity of the informer should be revealed. Those decisions are not left to the United States Attorney. Under the practice, he must secure the approval of the judge to make less than a full disclosure.

Such a practice results in making available to defense counsel *in advance of the trial* not only statements he could not get under the criminal discovery rules, but also reports of the investigative officers. Those reports are valuable because they summarize the government's case and usually indicate how the evidence will be used to prove the offense.

Judge Mahon left it to the parties to proceed under this practice, knowing that almost invariably it works out all discovery and bill of particular problems.

When the motion for new trial was presented to Judge Brewster, he inquired of defense counsel what he had failed to get. He said that his only complaint about discovery was that he was not given the statement of the defendant, Laurel, until Sunday[8] be-

8. In a place like Abilene, out-of-town lawyers awaiting trial usually work on their cases on weekends. Both prosecution and defense counsel arrived at Abilene several days before the trial and worked most of the Saturday and the Sunday before the trial started on Monday.

fore the case went to trial on Monday. That was considerably earlier than he could have obtained the statement if he had been held to what the law allowed him. Under 18 U.S.C. § 3500, he was not entitled to it until after Laurel testified on direct examination.

There is nothing in the record to indicate that the government knew, prior to the date it gave the statement to defense counsel, that Laurel would

actually testify. The indications were to the contrary. It had permitted him to remain in the same cell block in jail with Lerma and Salinas for some time. During that period, Lerma and Salinas did not suspect that he would be a witness against them, for they were congenial with him. The first indication of suspicion that he would be a government witness came after he was separated from them shortly before the trial, when Salinas' uncle called Mrs. Laurel and told her that "it would not help" Laurel if he testified for the government.

Cases involving substantial traffic in dope are ones where this Court does not require disclosure in advance of the trial of matters that may affect the welfare of witnesses. A man who would traffic dope into schools would not hesitate to threaten or harm a witness if he thought he could help his defense by doing so.

Prior to the trial, the United States Attorney gave to defense counsel a Xerox copy of all of the government[9]

9. The defense got much more than the law required. It got all the official reports of the narcotics agents and statements of persons who did not testify.

file except a few small portions dealing with unrelated conspiracies involving other persons which were excerpted. A Xerox copy of the *complete* file was furnished the Court with the excerpts properly identified. The Court examined the entire file *en camera* and concluded that the excerpts related to matters having no possible relevance, and did not require such excerpted matters to be furnished to the defense. That file is being sealed and made a part of the records in this case for examination by the appellate court. That was the practice followed by this Court in United States v. Ramzy, 5 Cir., 446 F.2d 1184 (1971), where Chief Judge Brown said at p. 1187:

"Finally, we reject the argument that the defense was prejudiced by the denial of access to a small portion of the government's file. The

Trial Court, in fact, was extraordinarily generous in its allowance of discovery, and after examining the excluded material we have found that it contains nothing that could possibly have materially aided the defendant in the preparation of his case."

380 F.Supp. 1263–1264.

We add only that our own examination of the sealed file confirmed the accuracy of Judge Brewster's appraisal of its contents.

Error in respect of these rulings is not demonstrated.

## V   The Severity of Salinas' Sentence

■   We come finally to consider the separate contention of Salinas that imposition upon him of the maximum confinement sentence provided under Title 21, U.S.C. §§ 841(a)(1), and 846, 15 years, violated his Amendment VIII rights prohibiting the infliction upon him of cruel and unusual punishment. This question need not detain us for long.

It is urged that Salinas' age, 26 years [10] at the time of trial, his record of honorable military service for three years after completion of high school, his holding of several respectable jobs after his separation from the military, and his plans for further education, together with his lack of any serious [11] prior criminal record, entitled him to receive some lesser sentence. The sentence imposed is asserted to be cruel and unusual punishment, violative of the Amendment VIII.

The government counters by pointing to the pollution of the health and morals of college boys, varsity football players, et cetera, by execution of a sinister and deep laid plan to distribute cocaine to these young people and through them to other college age youngsters, emphasizing in this connection that the telephone records introduced indicated calls placed by members of the conspiracy to a number of cities known to be university centers, viz: Austin, Denton, Huntsville, Waco and Kingsville, Texas. Salinas is identified as the hub of the conspiracy, the person who initiated it by seeking out Laurel to inquire if he had connections for cocaine and by arranging for the supply from Sandoval Martinez, on a credit basis, through Lerma's friendship with Martinez and his own friendship with Lerma. The government urges consideration in this connection also of the testimony as to Salinas drawing a .357 Magnum pistol on the arresting officers, as indicating his contempt for the law and his hardened character.

With all these considerations before him, we cannot say that the able and experienced trial judge abused his discretion in the imposition of a maximum confinement sentence. The record demonstrates in numerous places Judge Brewster's meticulous concern for the rights of the appellants on trial. Indeed, in no other respect than the length of the sentences imposed do counsel on appeal in any way question Judge Brewster's fairness.

■   We refuse, in conscience, to adopt a rule to the effect that a maximum sentence, ipso facto, is cruel and unusual punishment when imposed upon a criminal defendant without a serious prior record. To do so would be to effectively repeal the maximum sentence which the Congress has given trial judges discretion to impose.

No infirmity is demonstrated in the sentence imposed upon Salinas.

Affirmed.

---

10. Although, except for Lerma, aged 31 years, and perhaps Sandoval Martinez, whose age does not appear, he was the eldest of the persons charged in the conspiracy. Laurel was 22, Guevara 24, Walker 23, Branum 25, Branum's wife Kathleen, 26, Hattersley 21, Cowan 20, and the three T.C.U. football players, Speake, age 23, a senior, Ray, age 23, a senior, and Garnett, age 20, a junior at T.C.U.

11. On cross-examination he admitted out of the presence of the jury that at age 20 he had served 50 days of a sixty-six day sentence in California for a misdemeanor offense, violation of Section 11 of the Health Safety Code of California either for being in a house where narcotics were being used, or for being in a place where marijuana was being smoked. The trial judge expressed the view that this offense did not involve moral turpitude and excluded evidence of it from consideration of the jury.